IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIAZAR SANCHEZ, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**FRITO-LAY, INC.,**<br><br>Defendant. | 1:14-cv-00797 AWI-MJS<br><br>**FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT BE DENIED**<br><br>**[Doc. 9]**<br><br>**OBJECTIONS DUE WITHIN FOURTEEN (14) DAYS** |

On December 11, 2014, Plaintiff Eliazar Sanchez, on behalf of himself and others similarly situated (hereinafter collectively referred to as "Plaintiffs"), filed a motion for preliminary approval of a class action settlement. (ECF No. 9.) On January 22, 2015, Defendant, Frito-Lay, Inc., filed a statement of non-opposition to the motion.

The motion was referred to the undersigned magistrate judge for findings and recommendations pursuant to 28 U.S.C. § 636(b). The hearing on Plaintiffs' motion took place on January 30, 2015. Counsel Jerusalem Beligan appeared telephonically on behalf of Plaintiffs and counsel Ashely Hirano appeared telephonically on behalf of Defendant.

1

1    At the hearing, the Court requested further briefing from the parties. (ECF No. 11.)

2    Plaintiffs provided supplemental briefing to the Court on March 6, 2015. (ECF No. 14.)

3    On April 28, 2015, the Court vacated further hearings in the matter, and took the motion

4    under submission. (ECF No. 15.) Accordingly, the matter stands ready for adjudication.

5    **I.    BACKGROUND**

6        **A.    Allegations in the Complaint**

7        The operative complaint in this action was filed in Kern County Superior Court on

8    April 11, 2014, and removed to this court on May 23, 2014. (ECF No. 1.) Plaintiffs filed

9    the complaint against Defendant alleging violations of the California labor code including

10   failure to pay regular hourly wages, failure to pay overtime wages, failure to pay the

11   correct overtime rate of pay, failure to pay premium wages for denial of meal and rest

12   periods, failure to pay vested vacation wages, illegal deductions of vested vacation

13   wages, breach of contract for failure to pay vested wages, failure to pay final wages due

14   upon termination, failure to provide accurate itemized wage statements, and violations of

15   California Unfair Competition Law. (Id.)

16       Plaintiffs reside in California and were employed as non-exempt hourly

17   employees of Defendant whose job positions did <u>not</u> include "merchandiser," "route

18   sales representatives," "relief sales associates," or "route salespersons." (Compl. ¶¶ 27,

19   ECF No. 1.) Defendant owns and operates plants, manufacturing sites, distribution

20   centers, warehouses, facilities, branches and cost centers throughout California

21   including, but not limited to, manufacturing sites in Kern County and Rancho

22   Cucamonga. (Id. at ¶ 3.) Defendant also owns and operates distribution centers located

23   in Chula Vista, Santee, Vista, City of Industry, Bloomington, Murrieta, Sylmar, Nipomo,

24   Ventura, Bakersfield, Lancaster, El Toro, Torrance, La Mirada, Palm Springs and

25   Victorville. (Id.)

26       In the complaint, Plaintiffs assert that the above violations were a result of

27   Defendant's policies and practices such as rounding time in a manner that did not

28   compensate class members for all hours worked, not paying overtime at the correct rate,

failing to either provide class members uninterrupted meal periods or compensate them an additional hour of pay for non-compliant meal periods, failing to provide appropriate rest periods, and failing to allow accrued vacation to carry over from year to year or to provide accrued vacation pay at termination. (Id. at 4.)

At the time the complaint was filed the named plaintiff, Eliazar Sanchez resided in and was employed by Defendant at a plant located in Kern County. (Id. at 23.)

Besides the issuance of a scheduling order by the Court on September 3, 2014, no substantive actions have taken place with regard to this matter prior to the filing of the instant motion for preliminary approval of the class action settlement.

**B.      Terms of the Proposed Settlement Agreement**

The parties seek to approve a single class for purposes of settlement only.  The class would consist of employees of Defendant in California who held the title of maintenance mechanic. The agreement does not specify the dates when the class members were required to be employed by Defendant, but the parties stipulate that the member class consists of 137 current and former maintenance mechanics who worked at manufacturing and warehouse plants throughout California.

Under the terms of the proposed settlement, Defendant agrees to pay $600,000.00 ("gross settlement amount") to resolve the claims of any class members who timely return to the claims administrator a consent and claim form.

The parties propose the following deductions from the gross settlement amount:

• $15,000.00 to Sanchez, the named plaintiff, as an incentive award for his services and participation as class representative;

• Up to $198,000.00 (33 percent of the gross settlement fund) to class counsel for attorney fees;

• Up to $20,000.00 in legal costs and expenses;

• Up to $10,000.00 in claims administrator costs; and

• The remaining settlement amount of roughly $357,000 is to be distributed to individual class members.

Of the individual settlement payments provided to individual class members, 50% of the payment would be allocated to the member's wage claim and be subject to payroll withholding, and the other 50% would be for wage penalties and interest and not subject to withholding. (Memo. P&A for Prelim. Approval, ECF No. 9-1 at 8.)

The settlement provides that if the net settlement amount exceeds the sum of the individual payments, the remaining funds will first be used to pay Defendant's own tax obligations on payments made under the settlement agreement, and the remainder distributed *cy pres* to The United Way, with 50% of the latter distribution earmarked for a veteran's organization arm of the United Way if practicable.

The parties agree that recovery would be allocated based on the number of weeks worked by each class member during the class period relative to the total number of weeks worked by all members during the period. Each class member would receive his proportionate share of the payout fund based on such calculations. Defendant would examine the time and payroll records of each class member to calculate the gross settlement amount due each member and provide that information to the class administrator within 30 days after the close of the class period.

Funds uncollected by a class member would be held as unpaid funds and paid out as described above with regard to excess funds—used to pay Defendant's employer-owed tax obligations on the wage payments made under the agreement, with any residual remaining thereafter  distributed *cy pres* to The United Way.

## II.    CONDITIONAL CLASS CERTIFICATION

For the purposes of the proposed settlement, the parties request the Court to provisionally certify the class. See, Mot. at 13.

To certify a class, a plaintiff must demonstrate that all of the prerequisites of Rule 23(a), and at least one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure have been met. Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013). When determining whether to certify a class for settlement purposes, a court must pay "heightened" attention to the requirements of Rule 23. Amchem Prods., Inc. v.

1   Windsor, 521 U.S. 591, 620 (1997); Narouz v. Charter Communs., LLC, 591 F.3d 1261,

2   1266 (9th Cir. 2010). Indeed, "[s]uch attention is of vital importance, for a court asked to

3   certify a settlement class will lack the opportunity, present when a case is litigated, to

4   adjust the class, informed by the proceedings as they unfold." Amchem Prods., Inc., 521

5   U.S. at 620.

6        In order to depart from the usual rule that litigation is conducted by individually

7   named parties, "a class representative must be part of the class and 'possess the same

8   interest and suffer the same injury' as the class members." Wal-Mart Stores, Inc. v.

9   Dukes (Wal-Mart), 131 S.Ct. 2541, 2550 (2011). Rule 23(a) provides that the named

10  plaintiffs are appropriate representatives where: "(1) the class is so numerous that

11  joinder of all members is impracticable; (2) there are questions of law or fact common to

12  the class; (3) the claims or defenses of the representative parties are typical of the

13  claims or defenses of the class; and (4) the representative parties will fairly and

14  adequately protect the interests of the class." These requirements ensure that the class

15  claims are limited to those fairly encompassed by the named plaintiff's claims. Wal-Mart,

16  131 S.Ct. at 2550.

17       Additionally, Plaintiffs seek certification of a class under Federal Rule of Civil

18  Procedure 23(b)(3), which requires a demonstration that questions of law or fact

19  common to class members predominate over any questions affecting only individual

20  members and that a class action is superior to other available methods for fairly and

21  efficiently adjudicating the controversy.

22       Finally, it is noted:

23           Rule 23 does not set forth a mere pleading standard. A party
         seeking class certification must affirmatively demonstrate his compliance
24       with the Rule—that is, he must be prepared to prove that there are *in fact*
         sufficient numerous parties, common questions of law or fact, etc. We
25       recognized in Falcon that "sometimes it may be necessary for the court to
         probe behind the pleadings before coming to rest on the certification
26       question," [citation] and that certification is proper only if "the trial court is
         satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a)
27       have been satisfied, [citation]."

28  Wal-Mart, 131 S. Ct. at 2551 (italics in original).

### A.    Numerosity

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." General Tel. Co. v. EEOC, 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980). Courts interpreting the numerosity requirement have identified a variety of factors relevant to whether joinder of all class members would be impracticable including: (1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims, as affected by their financial resources, the size of the claims, and their fear of retaliation in light of an ongoing relationship with the defendant. See, e.g., Twegbe v. Pharmaca Integrative Pharm., Inc., 2013 U.S. Dist. LEXIS 100067 (N.D. Cal. July 17, 2013).

The parties have identified 137 class members. (Decl. of William Strom ¶ 4, ECF No 48-3.) Because the joinder of 137 plaintiffs would be impracticable, the Court finds the numerosity requirement is met.

### B.    Commonality

The commonality requirement is satisfied when a plaintiff shows that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists when the plaintiffs claims "depend upon a common contention" of "a nature that it is capable of classwide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).

The requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). However, it is insufficient to merely allege a common question, for example, "Were Plaintiffs passed over for promotion?" See Wal-Mart, 131 S.Ct. at 2551-52. Instead, they must pose a question that "will produce a

1   common answer to the crucial question why was I disfavored." Id. at 2552; see also id. at

2   2551 ("What matters to class certification is not the raising of common 'questions' ... but,

3   rather the capacity of a classwide proceeding to generate common answers apt to drive

4   the resolution of the litigation." (internal citation, alteration, and quotation marks

5   omitted)). In other words, plaintiffs must have a common question that will connect many

6   individual [employment] decisions to their claim for class relief.

7        Here, the common question posed by Plaintiffs is insufficient under Wal-Mart to

8   meet the commonality requirement. Wal-Mart, 131 S. Ct. 2541 at 2551, 180 L. Ed. 2d

9   374 ("Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion

10  over pay? Is that an unlawful employment practice? What remedies should we get?

11  Reciting these questions is not sufficient to obtain class certification.") "Commonality

12  requires the plaintiff to demonstrate that the class members 'have suffered the same

13  injury.'" Id. at 2551.

14       Plaintiffs have alleged a common question based on an alleged company-wide

15  policy, but have provided no information regarding the policy or how it is applied to class

16  members. Plaintiffs argue that the commonality requirement is met because "Defendant

17  implemented and applied employment policies and practices to all members of the Class

18  – through written policies and procedures implemented consistently at all of its California

19  facilities – and that the application of those policies systematically deprives members of

20  the Class of lawful earnings." (Mot., ECF No. 9-1- at 14-15.) Plaintiffs assert common

21  factual issues such as whether class members were denied rest and meal breaks, and

22  whether Defendant paid class members for the wages and premiums they were owed

23  due to lost meal and rest periods. (Id.) Based on such broad claims, and without any

24  further elaboration, Plaintiff asserts that the "claims exceed the minimum burden of

25  establishing commonality." (Id.) Such a conclusory statement does not establish

26  commonality. See Dukes, 131 S. Ct. at 2551 ("A party seeking class certification must

27  affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to

28  prove that there are in fact sufficiently numerous parties, common questions of law or

1  fact, etc.").

2      Plaintiffs do not even describe the policy of Defendant that resulted in the alleged

3  meal or rest break violations. Plaintiff provides nothing,  not even a declaration by him or

4  a co-worker, describing the violations at issue, how the policies at issue were applied,

5  the frequency of the violations, and whether the policies resulted in uniform rate of

6  violations as to each class member.

7      The Court, at the hearing on the motion, specifically advised that it lacked

8  information to enable it to determine if the class could be certified and the settlement

9  approved, and provided Plaintiffs an opportunity to provide further briefing on the motion

10  and address the Court's concerns.

11      Plaintiffs provided supplemental briefing on the issue, but went no further in

12  answering the Court's questions or addressing its concerns. Plaintiff did not even provide

13  added information regarding Defendant's policies. He explains in the supplemental

14  briefing that even if Defendant's policies and practices caused violations, more often

15  than not class members were provided proper meal and rest breaks. Counsel assumed

16  in calculating potential damages violations occurred only a quarter of the time. (Supp.

17  Mot. at 2-4.) Counsel provides nothing to explain, much less support, the assumed 25%

18  violation rate or explain how Defendant's written policies caused class members to be

19  unable to take proper meal or rest breaks roughly a quarter of the time.

20      Counsel describes how his firm spent significant time analyzing thousands of

21  pages of data and payroll records of 31 absent class members, and based thereon, was

22  able to extrapolate liability and damages for the balance of the class. (Mot. at 3.)

23  However, his briefings neglect to share with the Court any information about the process

24  or methods used in such efforts or the results thereof that might enable the Court to flesh

25  out details regarding the claims presented and the propriety of certification.  While the

26  Court has no reason to discredit Plaintiffs' and his counsel's claims, it cannot abdicate to

27  them its responsibility to independently review the facts and the alleged bases for the

28  claims and determine if common questions exist that will resolve issues central to the

1  validity of claims presented in one stroke. It is of particular concern that Plaintiffs'

2  counsel was so advised at the hearing and nevertheless provided virtually no helpful

3  supplementation to address the Court's concerns.

4      In short, the supplemental briefing raises more questions than it answers, and

5  provides the Court with little further basis for determining whether commonality is met.

6  "[I]n all class actions, commonality cannot be determined without a precise

7  understanding of the nature of the underlying claims. Parsons v. Ryan, 754 F.3d 657,

8  676 (9th Cir. 2014).

9      Without a more detailed and factually supported elaboration regarding the

10  policies at issue and the application of the policies to the member class, the Court

11  cannot conclude that there are no "dissimilarities within the proposed class" that "have

12  the potential to impede the generation of commons answers." Dukes, 131 S. Ct. at 2551

13  (citation and internal quotation marks omitted). Because there is no party contesting

14  class certification at the precertification settlement stage, the Court must ensure that the

15  rights of the putative class members are protected. This necessitates sufficient inquiry to

16  determine that there is commonality within the class. In this instance, Plaintiffs have

17  merely alleged a common violation of the law without showing a common contention of

18  such a nature that it is capable of class wide resolution; Plaintiff has not shown that

19  resolving truth or falsity will resolve an issue that is central to the validity of each of the

20  claims in one stroke. Wal-Mart, 131 S.Ct. at 2551.

21      In summary, the Court finds that Plaintiffs have not yet shown that class treatment

22  will generate common answers apt to drive the resolution of the litigation, and therefore

23  the requirement of commonality has not been met.

24      **C.    Typicality**

25      Typicality exists if "the claims or defenses of the representative parties are typical

26  of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is

27  whether other members have the same or similar injury, whether the action is based on

28  conduct which is not unique to the named plaintiffs, and whether other class members

1   have been injured by the same course of conduct." <u>Hanon v. Dataproducts Corp.</u>, 976

2   F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

3          Plaintiff state that his claims and the claims of the absent class members arise

4   from the same common source – Defendant's employment policies and practices. (Mot.

5   at 15.) This bare contention does not establish that the proposed class members

6   suffered injuries similar to the ones that Plaintiff allegedly suffered. Further, even

7   assuming that the class members suffered violations of their rights under the rest and

8   meal break regulations identified in the complaint, Plaintiff has not provided any

9   evidence that such violations were caused by the same course of conduct by Defendant.

10  Accordingly, Plaintiff has not provided sufficient information for the Court to determine

11  whether the commonality requirement is met.

12          **D.      Adequacy of Representation**

13          A plaintiff may bring claims on behalf of a class only if he "will fairly and

14  adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two

15  questions determines legal adequacy: (1) do the named plaintiffs and their counsel have

16  any conflicts of interest with other class members, and (2) will the named plaintiffs and

17  their counsel prosecute the action vigorously on behalf of the class?" <u>Hanlon v. Chrysler</u>

18  <u>Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998) (citation omitted).

19          Nothing indicates that Sanchez or his counsel have any conflicts of interest with

20  the putative class members or that their interests in this case are insufficient to ensure

21  vigorous representation of the class. It is possible that this requirement is met.  However,

22  Plaintiff has provided nothing to enable the Court independently to determine if he is in

23  fact an adequate representative of the absent class members. Further information is

24  needed to assist the Court in making such a determination. For example, Plaintiff could

25  provide a declaration describing, based on personal knowledge, how he was employed

26  in the same manner as the absent class members, and that he observed other absent

27  class members being subject to the same policies and practices of Defendant, resulting

28  in the same type of wage violations.

1    **E.    Rule 23(b)(3)**

2         This provision requires the Court to find that: (1) "the questions of law or fact

3    common to class members predominate over any questions affecting only individual

4    members," and (2) "a class action is superior to other available methods for fairly and

5    efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

6         Given the lack of evidence as described above, the Court is not able to find

7    predominance. The Court lacks sufficient information to determine whether class

8    members who held positions covered by the proposed class were subject to the same

9    conditions that led to the injuries that Sanchez suffered and that common questions

10   predominate over individual inquires.

11        For these reasons, the Court recommends that the request to conditionally certify

12   a settlement class be denied without prejudice.

13   **III.    LEGAL STANDARDS FOR APPROVAL OF CLASS SETTLEMENTS**

14        The Ninth Circuit has declared that a strong judicial policy favors settlement of

15   class actions. Allen v. Bedolla, 2015 U.S. App. LEXIS 9139 (9th Cir., June 2, 2015)

16   (citing In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008) and Class Plaintiffs

17   v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992)). Nevertheless, courts have long

18   recognized that the settlement of class actions presents unique due process concerns

19   based on district court's fiduciary duty to look after the interests of absent class

20   members. Allen, 2015 U.S. App. LEXIS 9139 at *12; Hanlon v. Chrysler Corp., 150 F.3d

21   1011, 1026 (9th Cir. 1998); see also, Staton v. Boeing Co., 327 F.3d 938, 972 n.22 (9th

22   Cir. 2003) (it is the district court's duty to police "the inherent tensions among class

23   representation, defendant's interests in minimizing the cost of the total settlement

24   package, and class counsel's interest in fees.").

25        To guard against the potential for abuse, "Rule 23(e) of the Federal Rules of Civil

26   Procedure requires court approval of all class action settlements, which may be granted

27   only after a fairness hearing and a determination that the settlement taken as a whole is

28   fair, reasonable, and adequate." In re Bluetooth Headset Products Liability Litigation ("In

1    re Bluetooth"), 654 F.3d 935, 946 (9th Cir. 2011).

2       Since a settlement agreement negotiated prior to formal class certification

3    creates a greater potential for a breach of the fiduciary duty owed to the class, "such

4    agreements must withstand an even higher level of scrutiny for evidence of collusion or

5    other conflicts of interest than is ordinarily required under Rule 23(e) before securing the

6    court's approval as fair." Allen, 2015 U.S. App. LEXIS 9139 at *13-*14 (quoting In re

7    Bluetooth, 654 F.3d at 946).

8       Review of the proposed settlement generally proceeds in two phases. True v.

9    American Honda Motor Co., 749 F.Supp.2d 1052, 1062 (C.D. Cal. 2010). At the

10   preliminary approval stage, such as we now face in the instant case, the Court

11   determines whether the proposed agreement is within the range of possible approval

12   and whether or not notice should be sent to class members. True, 749 F.Supp.2d at

13   1063. "If the proposed settlement appears to be the product of serious, informed, non-

14   collusive negotiations, has no obvious deficiencies, does not improperly grant

15   preferential treatment to class representatives or segments of the class, and falls within

16   the range of possible approval, then the court should direct that the notice be given to

17   the class members of a formal fairness hearing." In re Tableware Antitrust Litigation, 484

18   F.Supp.2d 1078, 1079 (N.D. Cal. 2007) (quoting Manual for Complex Litigation, Second

19   § 30.44 (1985)). At the final approval stage, the court takes a closer look at the

20   settlement, taking into consideration objections and other further developments in order

21   to make the final fairness determination. True, 749 F.Supp.2d at 1063.

22       The Ninth Circuit requires district courts to look for "subtle signs that class

23   counsel have allowed pursuit of their own self-interests . . . to infect the negotiations."

24   Allen, 2015 U.S. App. LEXIS 9139 at *14. Three subtle signs include: "(1) when counsel

25   receive a disproportionate distribution of the settlement; (2) when the parties negotiate a

26   'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a

27   certain fee request by class counsel); and (3) when the parties create a reverter that

28   returns unclaimed fees to the defendant. Id. (quoting In re Bluetooth, 654 F.3d at 943).

## IV.    PROPOSED SETTLEMENT AGREEMENT

### A.    Fairness of the Settlement

Here, as discussed below, the Court finds the proposed settlement has obvious deficiencies. Plaintiffs have not provided the Court with sufficient information to determine if it falls within the range of possible approval. Accordingly, it is recommended that Plaintiffs' motion for approval of the proposed settlement be denied without prejudice.

### B.    The Settlement Process

The stipulated settlement was reached after the parties performed investigation and analysis of the claims and engaged in private mediation.

#### 1.    Procedural History

The action was commenced in the Kern County Superior Court on April 11, 2014, and removed to this Court on May 23, 2014. The complaint stated ten claims for relief, including: (1) failure to pay regular hours worked; (2) failure to pay overtime hours worked; (3) failure to pay overtime at the correct rate; (4) failure to pay meal and rest period violations; (5) failure to pay vested vacation wages; (6) illegal deduction of vested vacation wages; (8) failure to timely pay wages upon termination; (9) failure to provide accurate wage statements; and (10) unfair competition.

Sanchez was employed by Defendant as a maintenance mechanic, and worked an alternative workweek schedule ("AWS") consisting of four, ten hour days a week. Based on the difference in position and schedule of maintenance mechanics compared to employees not working alternative workweek schedules, counsel limited the proposed class to the 137 current and former maintenance mechanics that worked for Defendant throughout California.

The parties served written discovery, but then proceeded with mediation rather than continuing litigation. Informally, before the meditation, Defendant produced Sanchez's personnel file, AWS schedules, punch records, pay stubs, and employee

1    handbooks. Defendant also produced the payroll data of 31 randomly selected

2    mechanics. Counsel analyzed the payroll data to extrapolate liability and damages for

3    the rest of the class members. Based on the data, and conversations with Sanchez,

4    Plaintiffs' counsel determined that the potential certifiable claims were based on

5    Defendant's failure to provide appropriate and uninterrupted meal and rest breaks,

6    resulting unpaid pay premium, and derivative claims for failure to pay all wages upon

7    termination and provide accurate wage statements. (See Memo P&A, ECF No. 9-1 at 2-

8    3.)

9         Based on the meal and rest break claims, Plaintiffs assert that while they have

10   presented strong claims for relief, they acknowledge that Defendant has likewise

11   presented strong arguments why class certification is improper and Defendant otherwise

12   not liable for the claims. Based on the positions of the parties, and the uncertainty of

13   continued litigation, Plaintiffs assert that the settlement fair and reasonable, and should

14   be approved by the Court. Regrettably, neither party provides the Court with the facts

15   underlying these assertions nor any other basis upon which the Court might attempt to

16   verify the accuracy of the assertions.

17                    2.    The Motion Hearing and Supplemental Briefing

18        The Court held a hearing on the motion for preliminary approval of class action

19   settlement on January 30, 2015. At the hearing the Court informed the parties that they

20   had failed to provide the Court sufficient evidence to determine whether the class

21   settlement should be approved or conditional certification of the class be granted. (See

22   ECF No. 11.) Specifically, the Court noted that Plaintiffs had presented to the Court little

23   more than repetition of the bare legal claim, i.e., that based on Defendant's policies,

24   Plaintiffs were denied appropriate rest breaks. Plaintiffs provide no information regarding

25   the specific policies at issue, the frequency which the Plaintiffs were denied rest breaks,

26   the amount of damages potentially suffered by Plaintiffs, or whether the claims shared

27   sufficiently common questions of law and fact to be certified as a class action.

28   Accordingly, the Court requested supplemental briefing to enable it to fulfill its

1    obligations.

2          On March 6, 2015, Plaintiffs provided a supplemental motion to the Court. As

3    noted above, it did not supplement in any meaningful way.

4          In the supplemental briefing, Plaintiffs provide additional argument. According to

5    Plaintiffs' counsel, each class member could potentially collect up to $2,605.84,

6    equivalent to compensation for 82 meal or rest period violations per class member.

7          Plaintiffs' counsel also describes in the supplemental briefing how they spent

8    substantial administrative time to organize, summarize, and analyze the 3,120 pages of

9    documents containing employee payroll and policy information.  (Supp. P&A, ECF No.

10   14 at 1-2.) The theory of liability is further discussed: Plaintiffs contend that the claim is

11   based on two grounds: (1) that class members occasionally worked short meal periods

12   (less than 30 minutes) and were not paid a meal premium; and (2) class members were

13   not provided a second meal break for shifts of 10 hours or more. (Id. at 2.)

14          Further, the data reportedly indicated to counsel that class members did not

15   work all year due to vacations, illness, or injury, and instead averaged only 33.6 weeks

16   per year. (Beligan Decl. at ¶ 5.) Plaintiffs also acknowledge that class members likely did

17   not have a violation each day worked (in this case, 4 four days per week, based on the

18   alternative schedule of working four ten hour days per week). Taking into account that

19   class members did not always work four days per week, sometimes took full meal

20   periods, or did not work long enough on a given day to be eligible for a second meal

21   break, Plaintiffs assumed a violation rate of 25% for the meal break claim. (Id.) Based on

22   that assumed violation rate, and the average rate of pay, and the fact that Plaintiffs were

23   entitled to an award of an hour of wages for each missed meal break (See Cal. Lab

24   Code § 226.7), Plaintiffs calculated the maximum exposure for damages from missed

25   meal breaks at $683,044.80. (Beligan Decl. at ¶¶ 5-6.) The same assumptions and

26   maximum exposure was calculated with respect to the missed rest break claims. (Id. at ¶

27   7.) Accordingly, Plaintiffs' counsel computed the combined damages from those claims

28   as $1,366,089.60. (Id. at ¶ 8.) Based on that amount, Plaintiffs contend that the

1   $600,000 settlement represents roughly 44% of the total potential exposure, and based

2   on the uncertainties of continued litigation, is a fair and reasonable settlement amount.

3       **C.     Deficiencies**

4       Despite being told of the need and reasons for supplemental briefing, the parties

5   supplied the Court with only minimal information regarding the claims and whether the

6   proposed settlement is fair and reasonable. Plaintiffs' counsel contends that it spent

7   significant time conducting discovery and analysis of the data collected to assist in

8   determining the scope and viability of the claims. The Court has no reason to doubt that,

9   but as noted, has an obligation to independently evaluate the basis for the conclusions

10  drawn therefrom.

11      The most significant observation is that Plaintiffs' counsel assumed the violation

12  rate to be one meal violation per week and one rest break violation per week, but did not

13  specify how the data supported that assumption. Nothing indicates an attempt was made

14  to correlate the violation rate to the data collected from the 31 randomly selected

15  mechanics. Indeed, assuming a rate of one meal violation per week, the facts presented

16  to the Court suggest the calculation is incorrect:  Plaintiffs assert that class members

17  worked an alternative workweek schedule of four ten hour days. A 10 hour work day

18  presumes, as asserted by Plaintiffs' counsel, a requirement that they be provided a

19  second meal break. Plaintiffs further assert that the meal break claim is based on two

20  alternative theories: (1) that class members were not provided an adequately long meal

21  break, and (2) class members were not provided a second meal break as required for

22  shifts of ten hours or more. Based on these theories, if class members adhered to the

23  alternative workweek schedule, each class member would be entitled to two meal breaks

24  per workday, or eight meal breaks per work week. However, in assuming a rate of

25  violation, Plaintiff's counsel assumed one missed break per week, or a violation rate of

26  roughly 13%, not the 25% Plaintiff claims. Regardless, the Court cannot determine

27  whether either violation rate is reasonable based solely upon Plaintiffs bald assertions

28  that its rate is reasonable. If the evidence supports an assumption that class members

suffered a violation every fourth meal break, then Plaintiffs potential damages would be higher than asserted.

### 1.    Range of Possible Approval

To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." In re Tableware Antitrust Litig., 484 F. Supp. 2d at 1080.

Plaintiffs state that the proposed settlement is reasonable because it was the result of arms' length negotiations facilitated by an experienced mediator, and recognizes the risks and uncertainty of continued litigation with regard to both parties. (Mot. at 7-8.) This bare assertion, lacking factual support for the assumptions upon which it is based, is insufficient for the Court to determine that the settlement falls within the range of possible approval. Without more concrete information regarding the rate of violation, the amount of potential recovery could suffer from unreasonably large variations.

### 2.    Preferential Treatment

The Court is not convinced that the proposed scheme for distributing funds to each class member would not unfairly benefit some class members at the expense of others. The distribution scheme is based primarily on the number of pay periods that each of the class members worked. The named Plaintiff seeks to represent individuals who held the position of maintenance mechanics. Plaintiff has provided no information about the nature of these positions. Specifically, Plaintiff has not identified the range of hourly wages paid to employees in job positions he seeks to represent or explain why a settlement payment based entirely on pay periods worked does not provide preferential treatment to class members who worked on a part-time basis or were paid at a lower hourly rate. Without this information, the Court cannot conclude that the settlement does not provide preferential treatment to some class members.

### 3.     Employer Tax Obligations

Further, Plaintiffs do not explain why it would be fair to the putative class members to satisfy Defendant's employer payroll tax obligation out of the residual settlement amount. District courts have been tasked with the responsibility to review settlement agreements for "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." Allen, 2015 U.S. App. LEXIS 9139 at *14 (citing In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935 at 947.). One potential sign is when the parties arrange for fees not awarded to revert to the defendant rather than be added to the class fund. Id.

To the extent that the parties contend that this does not act as a reversion, as the money is not directly returned to Defendant, the net effect is the same. While Defendant's potential use of the residual amount is limited to a specific purpose, there is no indication that class members benefit from that provision of the settlement. Absent further explanation, this term of the settlement appears to only benefit Defendant to the detriment of the *cy pres* plaintiffs otherwise be entitled to the residual amounts.

### 4.     Scope of the Releases

Due process requires that any class member bound by a class action settlement, at a minimum, be afforded the opportunity "to remove himself from the class." Ortiz v. Fibreboard Corp., 527 U.S. 815, 848, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999) (citation and internal quotation marks omitted). Here, the stipulated settlement agreement is devoid of any provision that would exclude class members who do not receive notice of this litigation. Indeed, the release provisions of the settlement agreement provide that, unless a class member opts out of the litigation, that class member will release all state-law claims against Defendant that were brought in the complaint or could have been brought against Defendant based on the allegations in the complaint. (Beligan Decl., Ex. 1 at 9.)

A class member cannot opt out of the litigation unless he submits a request to be excluded. (Id. at 31-32.) A class member cannot request to be excluded unless he has

18

notice of this litigation. Under the settlement agreement, the claims administrator would send a notice and claim form to the last-known address of each class member via first-class mail. (Id., Ex. 1 ¶ 12(d).). This proposed notice procedure does not guarantee that each of the putative class members will receive notice. Because the stipulated settlement agreement does not exclude from the settlement any class member whose class notice is returned as undeliverable by the post office, the Court cannot conclude that the settlement agreement affords minimum due process to each of the putative class members.

### 5.      Request for Attorneys' Fees and Costs

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h). Under the settlement, Class Counsel is entitled to a fee award "not to exceed $198,000," representing 33% of the settlement fund. (ECF No. 9-3 at 21) and expenses not to exceed the amount of $20,000. (Id.)

The Court must determine whether the requested attorneys' fees and expenses, the settlement administrator cost, and the class representative's incentive award and enhancement are fair and reasonable. For the reasons set forth below, the Court recommends the amount of attorneys' fees and the amount of incentive award that Plaintiff seeks be reduced, but the full amounts of requested litigation and administration costs be recovered.

### i.      Attorneys' Fee Award

When a negotiated class action settlement includes an award of attorneys' fees, the fee award must be evaluated in the overall context of the settlement. Knisley v. Network Assocs., 312 F.3d 1123, 1126 (9th Cir. 2002). At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." Bluetooth, 654 F.3d at 941; see also Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328-29 (9th Cir. 1999) ("[T]he district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.").

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and class counsel "turns adversarial." In re Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994). The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

Id. at 1302 (internal quotation marks, citation omitted). As a result the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. Id.; Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

Upon reviewing the proposed fee award, the Court must ensure that the fee award is reasonable considering the degree of success in the litigation and benefit to the class, and if upon determining that it is an unjustifiably disproportionate award, the Court should adjust the lodestar or percentage accordingly. Bluetooth, 654 F.3d at 945.

The Ninth Circuit has approved two methods of determining attorneys' fees in cases where, as here, the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. Id. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." Fischel v. Equitable Life Assurance Soc'y of the U.S., 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class. Id. The percentage method is particularly appropriate in common fund cases where "the benefit to the class

1   is easily quantified." Bluetooth, 654 F.3d at 942. In the Ninth Circuit, a 25 percent award

2   is the "benchmark" amount of attorneys' fees, but courts may adjust this figure upwards

3   or downwards if the record shows "'special circumstances' justifying a departure." Id.

4   (quoting Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.

5   1990)).

6          To assess whether the percentage requested is reasonable, courts may consider

7   a number of factors, including "the extent to which class counsel achieved exceptional

8   results for the class, whether the case was risky for class counsel, whether counsel's

9   performance generated benefits beyond the cash settlement fund, the market rate for

10  the particular field of law (in some circumstances), the burdens class counsel

11  experienced while litigating the case (e.g., cost, duration, foregoing other work), and

12  whether the case was handled on a contingency basis." In re Online DVD-Rental

13  Antitrust Litigation, 779 F.3d 934, 954-55 (9th Cir. 2015) (internal quotation marks

14  omitted). The Ninth Circuit has permitted courts to award attorney's fees using this

15  method "in lieu of the often more time-consuming task of calculating the lodestar."

16  Bluetooth, 654 F.3d at 942.

17         In contrast to the benchmark method, determining the lodestar amount is "often

18  more time-consuming[.]" Bluetooth, 654 F.3d at 942. Plaintiffs bring various state law

19  claims, and under California law "[t]he primary method for establishing the amount of

20  reasonable attorney fees is the lodestar method." In re Vitamin Cases, 110 Cal. App. 4th

21  1041, 1053, 2 Cal. Rptr. 3d 358 (2003) (internal quotation marks and citations omitted).

22  The Court determines the lodestar amount by multiplying a reasonable hourly rate by the

23  number of hours reasonably spent litigating the case. See Ferland v. Conrad Credit

24  Corp., 244 F.3d 1145, 1149 (9th Cir. 2001). The Ninth Circuit recommends that district

25  courts apply one method but cross-check the appropriateness of the amount by

26  employing the other, as well. See Bluetooth, 654 F.3d at 944.

27         Because this case involves a common settlement fund with an easily quantifiable

28  benefit to the class, the Court will evaluate attorneys' fees first using the benchmark

1  method but will incorporate a lodestar cross-check to ensure the reasonableness of the
2  award. See Vizcaino, 290 F.3d at 1047.

3          ii.      Reasonableness of the Percentage

4       As stated above, the Ninth Circuit has consistently approved a "benchmark"
5  award of 25 percent of the common fund. Bluetooth, 654 F.3d at 947; Staton, 327 F.3d
6  at 952; Six (6) Mexican Workers, 904 F.2d at 1311. Here, the settlement agreement
7  provides that class counsel may be awarded up to 33 percent of the gross settlement
8  amount—i.e., $198,000 of the $600,000 common fund. (ECF No. 9-3 at 21.)

9       In Plaintiff's supplemental motion, counsel states that it will be seeking the full
10 amount requested, $198,000, or roughly 33% of the gross settlement. (Supp Mot., ECF
11 No. 14 at 5-6.) Counsel argues that an upward departure from the benchmark 25% is
12 warranted. Counsel contends that despite the fact that the case has not been
13 contentiously litigated, that counsel has performed a substantial amount of work, in fact,
14 the same amount of work that would have been performed to prepare for a motion for
15 class certification. (Id. at 6.)

16      Specifically, counsel describes it efforts in the case, which include interviewing
17 Plaintiff, preparing and filing a complaint in state court, preparing for and attending a
18 status conference, propounding written discovery, noticing a deposition, engaging in
19 informal discovery, including reviewing and analyzing employee records, attending
20 mediation, and preparing and filing the motion for preliminary approval and a
21 supplemental motion requested by the Court. (Id. at 6-7.) Notably, counsel contends that
22 it took hundreds of hours of time to review and analyze employee records to extrapolate
23 potential damages.  (Id.)

24      With respect to the contingent nature of litigation, courts tend to find above-
25 market-value fee awards more appropriate in this context given the need to encourage
26 counsel to take on contingency-fee cases for plaintiffs who otherwise could not afford to
27 pay hourly fees. See, e.g., In re WPPSS Sec. Litig., 19 F.3d 1291, 1299 (9th Cir. 1994).
28 Moreover, when counsel takes cases on a contingency fee basis, and litigation is

1    protracted, the risk of non-payment after years of litigation justifies a significant fee

2    award. See id. Thus, that class counsel had significant experience in this field and took

3    on this matter on a contingent fee basis indicates that the 25 percent benchmark fee

4    request is reasonable. However, the matter has not been contentiously litigated, nor has

5    the matter been protracted, as the action has been pending for little over a year.

6         The results obtained and amount of work counsel performed on this case would

7    support a benchmark 25 percent award of attorneys' fees. See Hensley v. Eckerhart,

8    461 U.S. 424, 436, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) (noting that the "most critical

9    factor" to the reasonableness of an attorney fee award is "the degree of success

10   obtained"). Here, class counsel achieved for the class a pre-certification settlement upon

11   significant review of informally exchanged employee records, relatively early in the

12   course of litigation. While counsel propounded discovery, it does not appear that formal

13   discovery proceeded, or that any preliminary motions, but for the instant motion for

14   preliminary approval, have been brought or argued.

15        The result of the settlement, if approved, would result in significant recovery to the

16   class members. Each class member could be eligible for up to $2,600 in recovery. The

17   Court concludes that this result renders the 25 percent benchmark attorneys' fee award

18   reasonable. However, the Court sees little about the procedural history of the case, the

19   nature of Plaintiffs' claims, or the amount and quality of representation by Plaintiffs'

20   counsel that would warrant an upward departure from the benchmark award.

21        The complaint was brought alleging standard claims for damages under the

22   relevant California wage and hour laws. Moreover, during the course of litigation, the

23   case was removed to federal court based on jurisdiction under the Class Action Fairness

24   Act ("CAFA"). Congress intended the terms of CAFA to be interpreted expansively to

25   permit a defendant to remove certain class or mass actions into federal court. See Ibarra

26   v. Manheim Invs., Inc., 775 F.3d 1193, 1197 (9th Cir. 2015). Accordingly, the removal of

27   the action to this court was neither unusual nor unexpected.

28        Further, while thousands of pages of documents were exchanged, Plaintiffs'

1   counsel has not presented compelling arguments that the efforts to conduct discovery or

2   analyze the evidence presented were particularly onerous. When dealing with wage and

3   hour claims spanning over many years, it is inevitable that thousands of pages of

4   records would exist with regard to the payroll and other employment records of class

5   members.

6       Finally, Plaintiffs' motion for preliminary approval and conditional class

7   certification is not a cause for an upward departure. Such a motion is routine in class

8   action cases, and it or a substantially similar motion would be required in any successful

9   case that was decided prior to trial. Moreover, the contentions set forth in the motion

10  lacked sufficient detail, and in places stated little more than the basic legal standard or

11  theory supporting the specific claim. For example, no specific details were provided

12  regarding the policies and substantive facts to support certifying the meal and rest break

13  claims that are the basis of the suit. While Plaintiffs allege that Defendant had a policy

14  that caused the wage and hour violations, no detail regarding the policy was given.

15  Further, no detail regarding how, or for matter how often, the meal and rest break claims

16  occurred was provided in the motion or supporting papers. Plaintiffs' counsel asserts that

17  hundreds of hours were spent reviewing the supporting documents and analyzing the

18  claims, but provided no information regarding the results of the investigation and

19  analysis. That the Court's request for supplemental briefing was so unproductive

20  militates against an upward departure for attorney's fees.

21      In short, the above factors indicate that class counsel's request for an attorneys'

22  fee award in the amount of 33 percent of the common fund — i.e., $198,000—is likely

23  unreasonable. Next, the Court will cross-check the requested fees against the lodestar.

24              iii.    Lodestar Cross-Check

25      The Court now compares the amount requested to the lodestar, as calculation of

26  this amount, "which measures the lawyers investment of time in the litigation, provides a

27  check on the reasonableness of the percentage award." Vizcaino, 290 F.3d at 1050.

28  "The 'lodestar' is calculated by multiplying the number of hours . . . reasonably expended

1  on the litigation by a reasonable hourly rate." <u>Morales v. City of San Rafael</u>, 96 F.3d 359,
2  363 (9th Cir. 1996).

3      The lodestar method calculates attorney fees by "by multiplying the number of
4  hours reasonably expended by counsel on the particular matter times a reasonable
5  hourly rate." <u>Florida v. Dunne</u>, 915 F.2d 542, 545 n.3 (9th Cir. Cal. 1990) (citing <u>Hensley</u>
6  <u>v. Eckerhart</u>, 461 U.S. 424, 433 (1983)). The product of this computation, the "lodestar"
7  amount, yields a presumptively reasonable fee. <u>Gonzalez v. City of Maywood</u>, 729 F.3d
8  1196, 1202 (9th Cir. 2013); <u>Camacho v. Bridgeport Fin., Inc.</u>, 523 F.3d 973, 978 (9th Cir.
9  2008).

10     "In determining the reasonable hourly rate, the district court should be guided by
11  the rate prevailing in the community for similar work performed by attorneys of
12  comparable skill, experience, and reputation." <u>Chalmers v. City of Los Angeles</u>, 796 F.2d
13  1205, 1210-11 (9th Cir. 1986), amended on other grounds by 808 F.2d 1373 (9th Cir.
14  1987). The relevant community for the purposes of determining the prevailing market
15  rate is generally the "forum in which the district court sits." <u>Camacho v. Bridgeport Fin.</u>,
16  <u>Inc.</u>, 523 F.3d 973, 979 (9th Cir. 2008). In terms of the reasonable amount of time spent,
17  the Court should only award fees based on "the number of hours reasonably expended
18  on the litigation" and should exclude "hours that are excessive, redundant, or otherwise
19  unnecessary." <u>Hensley</u>, 461 U.S. at 433-34. "There is no precise rule or formula for
20  making these determinations[,]" and "[t]he court necessarily has discretion in making this
21  equitable judgment." <u>Id.</u> at 436-37.

22     "Once the court has fixed the lodestar, it may increase or decrease that amount
23  by applying a positive or negative 'multiplier' to take into account a variety of other
24  factors, including the quality of the representation, the novelty and complexity of the
25  issues, the results obtained, and the contingent risk presented." <u>Thayer v. Wells Fargo</u>
26  <u>Bank, N.A.</u>, 92 Cal. App. 4th 819, 833, 112 Cal. Rptr. 2d 284 (2001) (citation omitted).

27     The Court will first determine whether the hourly fee rate that led to that lodestar
28  amount is reasonable, then will address the number of hours billed. Then the Court will

1   compare the lodestar amount to the percentage-amount sought to determine whether it
2   is reasonable in light of the lodestar.

3                          a.      Reasonable Rate

4          "The first step in the lodestar analysis requires the court to determine a
5   reasonable hourly rate for the fee applicant's services. This determination involves
6   examining the prevailing market rates in the community charged for similar services by
7   lawyers of reasonably comparable skill, experience, and reputation." Cotton v. City of
8   Eureka, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (internal quotation marks and
9   citation omitted); see also Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir.
10  2008). The "relevant community" for the purposes of determining the reasonable hourly
11  rate is the district in which the lawsuit proceeds. Barjon v. Dalton, 132 F.3d 496, 500 (9th
12  Cir. 1997). "The fee applicant has the burden of producing satisfactory evidence . . . that
13  the requested rate is in line with those prevailing in the community." Jordan v.
14  Multnomah Cnty., 815 F.2d 1258, 1263 (9th Cir. 1987). In addition to affidavits from the
15  fee applicant himself, other evidence of prevailing market rates may include affidavits
16  from other area attorneys or examples of rates awarded to counsel in previous cases.
17  See Cotton, 889 F. Supp. 2d at 1167 (citation omitted). However, the actual rate that the
18  fee applicant charged is not evidence of the prevailing market rate. Id. (citing Schwarz v.
19  Sec'y of Health & Human Servs., 73 F.3d 895, 898 (9th Cir. 1995)).

20         Class counsel seeks reimbursement for three attorneys with ranging levels of
21  experience, all of whom work for Plaintiffs' law firm, Bisnar|Chase, LLP, and practice
22  almost exclusively in wage-and-hour class actions: John Bisnar, who acquired his J.D. in
23  1978, at a rate of $750 per hour; Brian Chase, who acquired his J.D. in 1993, at a rate of
24  $750 per hour; and Jerusalem Beligan, who acquired his J.D. in 2000, at a rate of $600
25  per hour. (ECF Nos. 14-1 to 14-3.) All three attorneys have asserted that their requested
26  rates are reasonable based in light of their level of experience, and rates charged in
27  other wage-and-hour actions. (Id.)

28         The hourly rates sought by counsel and the professional staff are not in accord

with the market rate for the relevant community. <u>Blum v. Stenson</u>, 465 U.S. 886, 895-96, 104 S. Ct. 1541, 79 L. Ed. 2d 891 and n.11 (1984). In general, the "relevant community" for purposes of determining the prevailing market rate, is the "forum in which the district court sits." <u>Camacho</u>, 523 F.3d at 979. Thus, when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate . . ." See <u>Jadwin v. County of Kern</u>, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Blum</u>, 465 U.S. at 895 n.11. The applicant meets this burden by "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." <u>Blum</u>, 465 U.S. at 896 n.11; see also <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate.") Plaintiffs' counsel has offered no evidence that the rates they seek in this motion are typical for attorneys practicing in this District. (ECF No. 14-1 to 14-3.) Moreover, the hourly rates sought by the attorneys and staff exceed those regularly awarded in the Fresno Division of the Eastern District of California.

To illustrate, in a recent case filed in the Sacramento Division of the Eastern District of California, an attorney in a wage and hour class action requested an hourly rate of $650. <u>Ontiveros v. Zamora</u>, Case No. 2:08-657-WBS, 303 F.R.D. 356 (E.D. Cal. 2014). The Court noted that the hourly rates were "high for even the most experienced attorneys in the Eastern District." <u>Id.</u> at 374 (citing <u>Johnson v. Allied Trailer Supply</u>, 2014 U.S. Dist. LEXIS 46992, 2014 WL 1334006, at *5 (E.D. Cal. Apr. 3, 2014); <u>Joe Hand Promotions, Inc. v. Albright</u>, 2013 U.S. Dist. LEXIS 114378, 2013 WL 4094403, at *2 (E.D. Cal. Aug. 13, 2013). Consequently, the Court calculated the lodestar with using

1  $400 as the hourly rate for more seasoned attorneys and $175 as the rate for associate

2  attorneys. Id. Although Ontiveros was filed in the Sacramento Division of the Eastern

3  District, it demonstrates that the hourly rates requested here do not align with those in

4  the Eastern District.

5                              1.    Attorneys

6        Recently, this Court has reviewed the billing rates for the Fresno Division and

7  concluded that "hourly rates generally accepted in the Fresno Division for competent

8  experienced attorneys [are] between $250 and $380, with the highest rates generally

9  reserved for those attorneys who are regarded as competent and reputable and who

10 possess in excess of 20 years of experience." Silvester v. Harris, 2014 U.S. Dist. LEXIS

11 174366, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014). For attorneys with "less than ten

12 years of experience . . . the accepted range is between $175 and $300 per hour." Id.

13 (citing Willis v. City of Fresno, 2014 U.S. Dist. LEXIS 97564, 2014 WL 3563310 (E.D.

14 Cal. July 17, 2014); Gordillo v. Ford Motor Co., 2014 U.S. Dist. LEXIS 84359, 2014 WL

15 2801243 (E.D. Cal. June 19, 2014)). With these parameters in mind, the hourly rates for

16 counsel must be adjusted to calculate the lodestar.

17        The hourly rates sought by counsel range from $600 to $750. (See ECF No. 14-1

18 at 8.) Hours for each of the attorneys who have been in practice 20 years or more –John

19 Bisnar and Brian Chase - will be calculated at the rate of $350 per hour. For attorney

20 Jerusalem Beligan, who has been in practice for fourteen years, the hourly rate is

21 adjusted to $275 per hour. Based upon the prior survey of the attorney fees in the

22 Fresno Division and the Court's own knowledge, these hourly rates are reasonable. See

23 Silvester, 2014 U.S. Dist. LEXIS 174366, 2014 WL 7239371 at *4; see also Ingram v.

24 Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse

25 its discretion either by relying, in part, on its own knowledge and experience" to

26 determine reasonable hourly rates).

27                           2.    Non-attorney Staff

28        Counsel calculated their lodestar using hourly rates ranging from $150 to $200 for

1   non-attorney staff. (See ECF No. 14-1 at 8-9.) Generally, paralegal rates within the

2   Fresno Division of the Eastern District range between $75 to approximately $150. See

3   Moreau v. Daily Independent, 2013 U.S. Dist. LEXIS 29085, 2013 WL 796621 at *3

4   (E.D. Cal. Mar. 1, 2013) (observing that "$75 for paralegals [is] reasonable for litigation

5   performed in this district"); Spence v. Wells Fargo Bank, N.A., 2012 U.S. Dist. LEXIS

6   32838, 2012 WL 844713 at *5 (E.D. Cal., Mar. 12, 2012) (approving "paralegal or other

7   support rates" of $125.00, $145.00 and $155.00); Silvester, 2014 U.S. Dist. LEXIS

8   174366, 2014 WL 7239371 at *4 ["The current reasonable hourly rate for paralegal work

9   in the Fresno Division ranges from $75 to $150, depending on experience."].

10   The hourly rate requested by counsel of $200 per hour for paralegals is

11   unreasonable. The rate shall be adjusted to $125 per hour to reflect a rate generally

12   awarded in the Fresno Division. The rates for the work of legal assistants are also

13   adjusted downward from $150 to $75 per hour.

14   iii.   Hours Expended

15   Counsel asserts that it has spent a total of 613[1] hours on this matter, and

16   anticipates spending at least 40 more to proceed through final approval. (ECF No. 14-1

17   at 8-9.) Counsel has provided a chart describing the number of hours worked by each

18   timekeeper. The Court notes that Counsel has not provided a detailed description of the

19   work provided and the number of hours spent on each task by each timekeeper. Such

20   detailed documentation was not necessarily required at the preliminary approval stage,

21   nor did the Court specifically order Counsel to provide such information.

22   However, without more detail regarding the hours spent on the matter, the Court

23   is not in a position to determine if the hours spent on the matter are reasonable, and will

24   not waste resources attempting to make such a determination at this time. Accordingly,

25   for the purposes of this motion, the Court will assume, without deciding that the billable

26   hours stated were reasonable.

27

28   _____

[1] The Court shall round all hourly calculations to the nearest whole number (i.e. omitting any fraction of an hour worked) as a matter of efficiency.

1

iv.   Lodestar Calculation

2       With the hourly rates set forth above and hourly amounts as stated by Counsel,

3  the lodestar in this action is $110,900:

4  **LEGAL PROFESSIONAL** **HOURS WORKED** **ADJUSTED RATE** **LODESTAR**

5  **Attorneys**

| LEGAL PROFESSIONAL | HOURS WORKED | ADJUSTED RATE | LODESTAR |
|---|---|---|---|
| **Attorneys** | | | |
| Brian Chase | 45 | $350 | $15,750 |
| John Bisnar | 56 | $350 | $19,600 |
| Jerusalem Beligan | 154 | $275 | $42,350 |
| **Paralegals** | | | |
| Javier Ruiz | 138 | $125 | $17,250 |
| Marylou Gilsleider | 46 | $125 | $5,750 |
| **Legal Assistants** | | | |
| Maria Dresser | 90 | $75 | $6,750 |
| Danielle Olson | 46 | $75 | $3,450 |
| | | **TOTAL**: | **$110,900** |

16       There is a strong presumption that the lodestar is a reasonable fee. <u>Gonzalez</u>,

17  729 F.3d at 1202; <u>Camacho</u>, 523 F.3d at 978. In this case, the benchmark award of 25%

18  of the common fund amounts to $150,000 - almost $40,000 more than the lodestar as

19  calculated above. The Court notes that the lodestar calculation above is not necessarily

20  accurate. For example, it does not account for additional fees, such as work that has yet

21  to be done on the matter. Likewise, the amount does not take into consideration any

22  reductions to the reported hours worked. However, based on the lodestar crosscheck as

23  calculated, it supports an award equal to the benchmark of 25%, and does not support

24  an increase to 33% of the common fund.

25       The Court notes that it is addressing a motion for preliminary approval, and the

26  final recovery amounts may differ from those stated by Plaintiffs. If settlement is

27  approved and the class recovers the amounts projected, then the foregoing analysis

28  would apply and the Court would recommend that amount of attorney fees be reduced to

$150,000. Accordingly, it is recommended that class counsel's request for attorney's fees be granted in the modified amount of 25% of the gross settlement fund, or $150,000, pending any adjustments in the recovery amounts and continued work by counsel. Additional review of the fee amount will be addressed upon the filing of a motion for final approval of the class action settlement.

6.     Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." Ontiveros, 303 F.R.D. at 375 (citations omitted). To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses - including reasonable travel expenses - in wage-and-hour class actions. Id. The settlement agreement provides that class counsel may obtain up to $20,000 in costs. (ECF No. 9-3 at 25.) Class counsel has submitted a list of itemized costs totaling $15,368.18 relating to this litigation, including filing fees; copying, scanning and imaging fees; costs associated with mediation; and hotels and travel costs associated with court appearances in Fresno. (ECF No. 14 at 12.) The Court concludes that these are reasonable litigation expenses incurred for the benefit of the class. See Harris v. Marhoefer, 24 F.3d 16, 19 (9th Cir. 1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things, "postage, investigator, copying costs, hotel bills, meals," and messenger services). Moreover, these costs are reasonably proportionate to the amount of attorneys' fees when compared to similar settlements. See, e.g., Navarro, 2010 U.S. Dist. LEXIS 41081, 2010 WL 1729538, at *3 (awarding $11,000 in costs in conjunction with $180,000 in attorneys' fees); Odrick v. UnionBancal Corp., No. C 10-5565 SBA, 2012 U.S. Dist. LEXIS 171413, 2012 WL 6019495, at *7 (N.D. Cal. Dec. 3, 2012) (awarding $20,000 in costs in conjunction with $875,000 attorneys' fees); Tarlecki v. bebe Stores, Inc., No. CV-05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, 2009 WL 3720872, at *6 (N.D. Cal. Nov. 3, 2009) (awarding $30,000 in costs in conjunction with $200,000 in attorneys' fees). The Court therefore finds class

1    counsel's request for cost reimbursement in the amount up to $20,000 reasonable.

2                    7.      Administration Costs

3        Plaintiffs also request reimbursement of up to $10,000 for the cost of paying ILYM

4    Group, Inc., to serve as claims administrator. (ECF No. 9-1 at 8.) Courts regularly award

5    administrative costs associated with providing notice to the class. See, e.g., Odrick, 2012

6    U.S. Dist. LEXIS 171413, 2012 WL 6019495, at *7. The Court concludes that the

7    amount of costs requested for ILYM Group, Inc., while subject to final approval, appear

8    reasonable.

9                    8.      Incentive Award

10       Plaintiffs also request that the Court approve an incentive payment in the amount

11   of $15,000 to be awarded to Sanchez as named plaintiff. (ECF No. 9-1- at 7-8.)

12       "Incentive awards are fairly typical in class action cases." Rodriguez v. West

13   Publ'g Corp., 563 F.3d 948, 958-59 (9th Cir. 2009). However, the decision to approve

14   such an award is a matter within the court's discretion. In re Mego Fin. Corp. Sec. Litig.,

15   213 F.3d 454, 463 (9th Cir. 2000). Generally speaking, incentive awards are meant to

16   "compensate class representatives for work done on behalf of the class, to make up for

17   financial or reputational risk undertaking in bringing the action, and, sometimes, to

18   recognize their willingness to act as a private attorney general." Rodriguez, 563 F.3d at

19   958-59. The Ninth Circuit has emphasized that "district courts must be vigilant in

20   scrutinizing all incentive awards to determine whether they destroy the adequacy of the

21   class representatives . . . . [C]oncerns over potential conflicts may be especially pressing

22   where, as here, the proposed service fees greatly exceed the payments to absent class

23   members. Radcliffe v. Experian Info. Solutions, Inc., 715 F.3d 1157, 1165 (9th Cir. 2013)

24   (internal quotation marks and citation omitted). A class representative must justify an

25   incentive award through "evidence demonstrating the quality of plaintiff's representative

26   service," such as "substantial efforts taken as class representative to justify the

27   discrepancy between [his] award and those of the unnamed plaintiffs." Alberto v. GMRI,

28   Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008). Incentive awards are particularly appropriate

1   in wage-and-hour actions where plaintiffs undertake a significant "reputational risk" by

2   bringing suit against their former employers. Rodriguez, 563 F.3d at 958-59.

3       Plaintiffs request an incentive payment of $15,000 to Sanchez. This award is

4   three times the amount that the Ninth Circuit has considered reasonable. See Resnick v.

5   Frank (In re Online DVD-Rental Antitrust Litig.), 779 F.3d 934, 947 (9th Cir. 2015). It is

6   also 2.5 percent of the gross settlement funds, which is higher than what other courts

7   have found acceptable. See Sandoval v. Tharaldson Emple. Mgmt., 2010 U.S. Dist.

8   LEXIS 69799 (C.D. Cal. June 15, 2010) (C.D. Cal. June 15, 2010) (collecting cases and

9   concluding that plaintiff's request for an incentive award representing one percent of the

10  settlement fund was excessive). Accordingly, the Court recommends that Sanchez's

11  incentive award be reduced from $15,000 to $7,500.

12  **V.    FINDINGS AND RECOMMENDATION**

13      The Court finds that Plaintiffs have not demonstrated that conditional class

14  certification under Rule 23(a) and (b)(3) or preliminary approval of the class action

15  settlement is warranted.

16      It is recommended that Plaintiffs motion for preliminary approval of the proposed

17  settlement and conditional class certification be denied without prejudice and Plaintiffs

18  be provided the opportunity to file a new motion for preliminary approval of the proposed

19  settlement that cures each of the deficiencies identified herein.

20      These findings and recommendations are submitted to the district judge assigned

21  to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.

22  Within fourteen (14) days of service of this recommendation, any party may file written

23  objections to these findings and recommendations with the Court and serve a copy on all

24  parties. Such a document should be captioned "Objections to Magistrate Judge's

25  Findings and Recommendations." The district judge will review the magistrate judge's

26  findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are

27  advised that failure to file objections within the specified time may result in the waiver of

28  rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter

1  v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

2

3  IT IS SO ORDERED.

4      Dated:   August 5, 2015          /s/ *Michael J. Seng*

5                                    UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28